UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

CLIFTON JETT TRANSPORT, INC.,        )
                                     )
              Plaintiff/             )
         Counter Defendant           )
                                     )
         v.                          )      No. 1:21-cv-01064-JPH-MKK
                                     )
BARRETTE OUTDOOR LIVING, INC.,       )
                                     )
              Defendant/             )
         Counter Claimant            )

**ORDER ON CROSS MOTIONS FOR SANCTIONS**

Court orders must be followed.  Parties who knowingly fail to do so proceed at their own peril.  Here, in cross motions for sanctions of contempt, the parties accuse each other of deliberately failing to comply with a discovery order.  Having considered the entire record and the parties' courses of conduct, the Court concludes that Clifton Jett Transport, Inc., ("CJT") violated the Court's orders by failing to produce records that it had been ordered to produce; that the conduct of CJT and its counsel, Benjamin Ellis, was objectively unreasonable and in flagrant disregard of the Court's orders; and that Barrette Outdoor Living, Inc., did not violate the Court's orders.

Therefore, as explained in more detail below, Barrette's motion against CJT, dkt. [72] is **GRANTED** to the extent that Barrette is **awarded its reasonable attorney's fees and costs as outlined in Section V of this Order**. CJT's motion against Barrette, dkt. [127], is **DENIED**.

1

# I.
# Background

## A. CJT's lawsuit against Barrette

CJT agreed to transport goods for Barrette for three years pursuant to an "Agreement for Transportation Service."  Dkt. 85-1.  Barrette closed its Indianapolis facility midway through the Agreement's three-year term.  Dkt. 1-1 at 4 (CJT's Complaint Aug. 22, 2021).[1]  In response, CJT sued Barrette for breach of contract.  *Id.* at 5.  CJT alleged that Barrette "breached the Agreement by failing to pay CJT the remaining value of the Agreement when it terminated the contract without cause."  *Id.* at 5-6.  CJT seeks to recover $370,003.26 in damages.  Dkt. 125 at 2 (Statement of Claims and Damages).

## B. Barrette's discovery request to CJT for evidence of mitigation

Early in the case, Barrette served CJT with an interrogatory for information regarding "all steps Plaintiff has taken in an effort to mitigate any of [its] damages."  Dkt. 73-1 at 11 (Interrog. No. 14).  CJT objected to the Interrogatory as "overly broad, unduly burdensome" and "vague and ambiguous as to the term 'mitigate.'"  *Id.* (CJT's response to Interrog. No. 14). CJT also responded that "it has performed work for AMAZON beginning in November 2020."  *Id.*  Barrette then tried, without success, to learn how much money CJT had earned from Amazon.  *See, e.g.,* dkt. 73-5 (Rule 30(b)(6) deposition).

## C. The Magistrate Judge's orders

---

[1] CJT filed its Complaint in Marion Superior Court, dkt. 1-1, and Barrette later removed it to this Court, dkt. 1.

The parties then had a discovery conference with the Magistrate Judge on May 23, 2022, to discuss Barrette's "communications and documents requests" to CJT. Dkt. 53. Following that conference, the Magistrate Judge issued an order ruling that CJT's records relating to "damages, including profits, income statements, balance sheets, etc." were relevant to Barrette's mitigation defense and therefore discoverable. *Id.* at 1 (the May Order). The May Order did not set a specific deadline for CJT to produce those records but ordered that "production shall be expedited and occur as soon as reasonably possible." Dkt. 53 at 2. The May Order informed Barrette that it could raise the issue with the Court if it believed that production was "being unnecessarily delayed." *Id.*

Barrette took the Magistrate Judge up on this offer and on July 14, 2022, the parties appeared for another discovery conference. Dkt. 63. Barrette argued that in the nearly two months that had passed since the May Order, "CJT ha[d] not produced any documents relating to its alleged lost revenue and other damages, nor its subsequent work for Amazon." Dkt. 64 at 2.

The Magistrate Judge ordered CJT to produce within seven days:

> (1) Documents showing CJT's revenues, expenses, and profits in 2019, 2020, 2021, and early 2022;
>
> (2) Documents and other records relating to lost revenue or other damages suffered by CJT; and
>
> (3) Documents relating to CJT's subsequent work for Amazon.

*Id.* (the July Order). The Magistrate Judge squarely rejected CJT's argument that it couldn't produce the records without Amazon's consent: "[t]he existence

of a contractual obligation for CJT to seek Amazon's permission before releasing any documents does not preclude this Court from issuing an order requiring CJT to produce these otherwise admissible documents." *Id.* at 2–3. The July Order further explained that CJT could designate materials as confidential according to the procedures laid out in the Protective Order. *Id.* (citing dkt. 42).

Meanwhile, at the same discovery conference, CJT argued that Barrette had not satisfied its obligations with respect to CJT's request for "more detailed information about [Barrette's] discovery efforts." *Id.* at 3. Specifically, CJT argued that Barrette had "not confirmed whether text messages had been searched, what search terms were used, or whether any other custodians were requested to provide any information." *Id.* In response, the July Order required Barrette to supplement its discovery responses within 14 days with "the following limited documents":

    (1) Confirmation whether text messages have been searched;

    (2) Information regarding search terms used during the searching of text messages and computer files; and

    (3) Information regarding the timing and parameters of searches of text messages, computer files, and physical documents.

*Id.*

A few days later, CJT sought an extension of time to comply with the July Order's requirement to produce documents related to its work for Amazon because CJT was "working with Amazon's counsel to secure authorization to

release these documents." Dkt. 65 (July 22 motion for enlargement of time to produce Amazon documents).

Barrette objected to CJT's request for additional time to comply with the July Order. Dkt. 68. Barrette asked the Court to "sanction Plaintiff and its counsel for Plaintiff's blatant disregard for the Court's orders by ordering Plaintiff to immediately comply with the Court's Discovery Conference Order and to reimburse Barrette's attorneys' fees and costs incurred in compelling the production of the documents." *Id.* at 6.

Then on August 1, 2022, explaining that it had just received authorization from Amazon to release "confidential" documents, CJT produced documents related to its work for Amazon that it "had gathered in May and June." Dkt. 114 at 10. That production included screenshots of Amazon invoice lists, an Amazon "rate sheet," and CJT's contract with Amazon, dkt. 114-4, but no documents that showed how much Amazon had paid CJT during the relevant period.

On August 2, Barrette sent CJT a verified letter that confirmed it had "searched for text messages" and "searched for text messages, emails, and other documents and files regarding the Agreement. . . from November 1, 2018 through September 28, 2020." Dkt. 128-9 at 1–2. The letter also explained steps that Barrette had taken to search for records regarding "the Agreement, the performance of the Agreement, the closure of Defendant's Indianapolis facility, the closure's effect on the parties' Agreement, and Defendants requests

for Plaintiff to continue to provide transportation services to Defendant." *Id.* at 2–3.

The Magistrate Judge granted CJT's motion for an enlargement of time on August 8, 2022, giving CJT until August 9 to produce the Amazon documents. Dkt. 71 at 3. The August 9, 2022, production deadline came and went with no additional Amazon documents produced by CJT. *See* dkt. 74 at 9. It's therefore undisputed that, as of August 9, 2022, CJT had not produced any documents showing how much it had been paid by Amazon, despite the May and July Orders.

On August 11, the parties conferred about their discovery obligations. Dkt. 114 at 10. CJT's counsel "explained again about . . . CJT's inability to obtain invoices through the AMAZON app" and "promised to revisit these issues with CJT directly to see if any other responsive documents existed." Dkt. 114 at 10–11. Notably, this issue—CJT's alleged inability to obtain invoices—had not been raised in CJT's motion for an extension of time to produce Amazon records. Dkt. 65 (citing CJT's need for Amazon's authorization as the sole reason for seeking more time to produce the Amazon records).

### D. Barrette's motion for contempt against CJT

Two weeks after CJT's August 9 deadline to comply had passed, Barrette filed a "Motion to Hold Plaintiff in Contempt," dkt. 72, which was referred to the Magistrate Judge for a Report and Recommendation. Dkt. 86. Barrette argued that CJT had "not produced a single document showing how much money it earned from its alleged work for Amazon" in 2020, 2021, or 2022. Dkt. 74 at

1–2.  As a sanction, Barrette sought dismissal of CJT's claims with prejudice and attorneys' fees and costs related to "seeking documents regarding Plaintiff's alleged work for Amazon and preparing and prosecuting this Motion." Dkt. 72 at 1.

On December 7, 2022, the Magistrate Judge issued an order finding CJT in contempt of court for violating the July Order and awarding Barrette its attorney's fees and costs as a sanction.  Dkt. 106.[2]  CJT objected, arguing that it had made reasonable efforts to substantially comply with the July Order because (1) it couldn't have produced any other responsive documents since CJT didn't have traditional financial records and was unable "to obtain the invoice records from the Amazon app" and (2) it had produced additional financial records since the motion and order for contempt had been filed.  Dkt. 114.

### E.  CJT's motion for contempt against Barrette

On March 15, 2023, CJT filed a "Motion for Contempt Order" against Barrette.  Dkt. 127.  CJT represented to the Court that it "continues to lack basic information about Barrette's discovery collection despite giving Barrette every opportunity to correct its contempt without the Court's involvement." Dkt 128 at 14.  CJT requested that the Court "hold Barrette and its counsel in contempt" and impose sanctions.  *Id.* at 15–16.

## II.
## Hearing on the contempt motions

---

[2] The Court construed the Magistrate Judge's December 7, 2022, order as a report and recommendation and gave the parties 14 days to file objections as permitted under 28 U.S.C. § 636(b)(1)(C).  Dkt. 113.

The Court held a hearing on both motions for contempt sanctions and CJT's objection to the Magistrate Judge's order/report and recommendation. Dkt. 144.[3]  At the hearing, CJT's counsel, Benjamin Ellis, called CJT's owner, Clifton Jett, as a witness.  Counsel for both sides presented argument and responded to questions from the Court.

A core purpose of the hearing was to determine what documents showing how much money CJT had earned from Amazon were in CJT's possession, custody, and control before the August 9, 2022, deadline to produce documents pursuant to the July Order.  Dkt. 114 at 1–2.  Also, CJT had requested that the Court hold an evidentiary hearing on Barrette's motion for contempt.  Dkt. 87.

Having considered the entire record, the Court makes the following findings:

### A. Mr. Jett possessed records showing how much Amazon paid CJT

Mr. Jett testified that he had a GED, but no further formal education or financial training, and that he only recently learned about balance sheets and profit and loss statements.  He further testified that CJT didn't have an accountant and that, to him, "financial documents" means tax records.

---

[3] The Court now has the benefit of additional argument of counsel and a more fully developed evidentiary record.  Under these circumstances, it is appropriate and in the interest of judicial economy to review the parties' course of conduct as a whole.  *See e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 643 (7th Cir. 2011) (sanctions are reviewed "not in isolation but in light of 'the entire procedural history of the case.'").  Therefore, the Court **rejects** the Report & Recommendation, dkt. [106], and reviews *de novo* both motions for contempt.  *See* 28 U.S.C. § 636(b)(1)(C).  CJT's objection is **DENIED as moot**.  Dkt. [114].

Mr. Jett explained that he began working as a "Delivery Service Partner" for Amazon sometime after September 11, 2020.  Since that time, Amazon has paid CJT through direct deposits into CJT's business bank account.  CJT had gross income of $2,675,546 in 2021, which was the first full year that CJT worked exclusively for Amazon.[4]

Mr. Jett testified that Amazon created invoices for the work that CJT performed.  Those invoices could be viewed in an "Amazon portal" that Mr. Jett has had access to since September 2020 when CJT began working with Amazon.  The portal's main landing page displayed a list of invoices organized by date, but that page didn't show how much CJT was paid for any specific invoice.[5]  To view the invoice "breakdown," Mr. Jett had to click on a specific invoice in the portal.  That would pull up a copy of the invoice which showed the work done and the corresponding amount Amazon paid to CJT.  Mr. Jett testified that he had reviewed the Amazon invoices only a couple of times because it was his "common practice . . . not to review these breakdowns."

On cross-examination, Mr. Jett admitted that he knew the full invoices showing the amounts that CJT was paid were located on and accessible to him through the portal.  Mr. Jett claimed, however, that he "couldn't physically get [the invoices] out" of the portal.

Mr. Jett initially testified that he had a concern about confidentiality with respect to providing the Amazon invoices to Barrette because they had the

_____

[4] *See* dkt. 114-3 at 6 (Hearing exhibit 2).
[5] *See e.g.*, dkt. 114-4 at 24–25 (Hearing exhibit 4).

word "confidential" at the bottom of each page each.  The concern was based on

his understanding that CJT's contract with Amazon prevented it from

disclosing confidential information.  However, he later explained that

confidentiality wasn't the reason that CJT did not produce the Amazon invoices

as ordered by the Court.  Instead, his "ability to get [the invoices] out of the

portal" was the only issue with providing copies of the Amazon invoices in

discovery.

### B. Mr. Ellis did not comply with the July Order or take reasonable steps to do so

After the July Order was issued, Mr. Ellis confirmed with Mr. Jett that he

had given Mr. Ellis all the documents that were available in the categories

required under the July Order.  Based on that conversation, on August 1,

2022, CJT produced the documents that Mr. Ellis had "determined existed"

including the screenshots of the Amazon portal, the Amazon "rate sheet," and

the Amazon contract.[6]  However, Mr. Ellis admitted that "there were no records

reflecting income from Amazon to Clifton Jett Transport in [20]21 or [20]22

that were produced" by August 9 even though those documents were "within

the scope" of the July Order.

At the hearing, Mr. Ellis maintained that between the time of the July 14

discovery conference and the August 9 deadline, he did not have the Amazon

invoice records or know that Mr. Jett could access them through the Amazon

portal.  But he also admitted that neither he nor his former co-counsel took

---

[6] *See* dkt. 114-4.

10

any additional steps to gather additional documents or to access the Amazon invoices between the July 14 discovery conference and the August 9 production deadline.  He stated that his former co-counsel worked with Mr. Jett to gain access to the invoice records only after Barrette filed its motion for contempt. In that meeting, former co-counsel was able to access the invoices.[7]

### III.
### Applicable Law

Each party has filed a motion asking the Court to exercise its inherent authority to hold the other in contempt as a sanction for discovery conduct. Dkt. 72; dkt. 74 at 9–10; dkt. 127; dkt. 128 at 15–16.  However, when a party's conduct "could be adequately sanctioned under the [Federal] Rules [of Civil Procedure], the court ordinarily should rely on the Rules rather than the inherent power." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991); *Corley v. Rosewood Care Cntr., Inc.*, 142 F.3d 1041, 1058–59 (7th Cir. 1998).  Federal Rule of Civil Procedure Rule 37(b)(2) provides an ample range of sanctions to address the parties' arguments regarding the other's "failure to comply with the court's discovery orders," *Ramirez v. T.H. Lemont, Inc.*, 845 F.3d 772, 775 (7th Cir. 2016), so the Court evaluates the parties' motions under Rule 37 rather than the contempt framework.[8]  Sanctions are appropriate when a party's

---

[7] According to the parties' statements at the hearing, it seems that, by this time, Amazon had already begun producing the invoice records pursuant to a non-party subpoena from Barrette, so CJT never produced the invoices.

[8] The Court construes Barrette's response to CJT's motion for an extension of time to respond to the July Order as a request to compel production under Rule 37(a).  *See* dkt. 68 (asking the court to order "Plaintiff to immediately comply with the [July Order] and to reimburse [fees] incurred in compelling the production of the

failure is the result of negligence, *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 643 (7th Cir. 2011), or "objectively unreasonable behavior," *Long v. Steepro*, 213 F.3d 983, 987 (7th Cir. 2000), or when a party acts with "flagrant disregard" of its discovery obligations, *Marrocco v. General Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992).

## IV.
## Discussion

### A. CJT and Mr. Ellis's response to the Court's orders was objectively unreasonable

Barrette argues that CJT did not comply with the July Order because it did not produce "any documents showing how much it earned, expensed, and profited from its work from Amazon."  *See* dkt. 74 at 11–12, 14; dkt. 120 at 13–16.  CJT has maintained that other than the documents it produced on August 1, *see* dkt. 114-4, it possessed no additional responsive information because it was unable "to obtain the invoices records from the Amazon app" and Mr. Jett doesn't keep traditional business or accounting records.  *See* dkt. 84 at 2, 21; dkt. 114 at 2, 10–11.

---

documents."); *Evans v. Griffin*, 932 F.3d 1043, 1048 (7th Cir. 2019).  Moreover, even if there were no "order to provide or permit discovery" within the meaning of Rule 37(b)(2)(A), the July Order, which resulted from a discovery conference requested by the parties, was a clear command from the Court ordering CJT to produce specific documents by a specific date. Therefore, regardless of whether there was a Rule 37(a) motion, the Court would reach the same result under either Federal Rule of Civil Procedure 16(f) (providing that Rule 37 sanctions and fees may be ordered for a violation of a "pretrial order"), or pursuant to its inherent authority, *Fuery v. City of Chicago*, 900 F.3d 450, 452; 454 (7th Cir. 2018) (district courts "possess certain inherent powers, not conferred by rule or statue, to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.").

The Magistrate Judge had ordered CJT to produce specific documents, including documents related to its revenue and its work for Amazon, by a specific date: August 9, 2022.  Dkt. 64 at 2; dkt. 71 at 3.  The Amazon invoices—which show exactly how much money Amazon paid CJT during the relevant period—were not produced by the Court-imposed deadline.

Those Amazon invoices are critical evidence in this case.  CJT sued Barrette in August 2021 for breach of contract and alleged that Barrette's breach caused it damages—the remainder of the amount that CJT would have been paid over the course of the three-year term of the Agreement.  When it learned of CJT's work for Amazon, Barrette sought to determine how much money CJT had earned from Amazon during the period that CJT was seeking damages for under the Agreement.  CJT would not produce that information, so Barrette sought the Court's assistance.  In May 2022, the Court ruled that mitigation related records were discoverable and ordered CJT to produce those records.  When it had failed to do so by July 2022, Barrette again sought the Court's assistance.  The Court ordered CJT to produce the mitigation records, including records showing how much it had been paid by Amazon during the term of the Agreement, by August 9, 2022.  Despite the Court's orders, CJT did not produce the Amazon invoices by the Court's deadline.  Sanctions are therefore warranted.  *Tamari v. Bache & Co. (Lebanon) S.A.L.*, 729 F.2d 469, 473 (7th Cir. 1984) ("The weight of authority, however, holds that the culpability of a party who fails to comply with a court order determines only

which sanctions the court should impose and not whether any sanctions are appropriate at all.").

Regarding culpability, the record shows that CJT's failure to comply with the Court's July Order was not the result of simple inadvertence, carelessness, or mistake. Rather, Mr. Jett knew that he had the Amazon invoice records all along. Despite that, he represented to counsel and to the Court that he "couldn't get them out of the portal." And Mr. Ellis made no additional efforts to comply with the July Order during the critical timeframe of July 19 through the August 9 deadline. Instead, CJT represented that it was unable "to obtain invoices through the Amazon app." Dkt. 114 at 2, 10. And only *after* Barrette filed its motion for contempt did CJT's counsel work with Mr. Jett to access the invoice records. CJT has presented no credible reason why the invoices were not produced by the August 9 deadline.

To the extent that Mr. Jett was recalcitrant to do what had to be done to get the invoices and provide them to his counsel, Mr. Ellis should have (1) ensured that Mr. Jett understood his obligation to comply with the Court's order by producing the documents; (2) worked with Mr. Jett to access the invoices so they could be printed or copied; and (3) informed Mr. Jett that failure to comply with the Court's orders would assuredly result in sanctions and/or counsel's withdrawal from the case. Instead, the record shows that neither made a reasonable attempt to comply with the July Order. Indeed, no steps were taken by CJT's counsel between July 14 and August 9 to access and produce the Amazon records.

Thus, the Court concludes that neither CJT nor its counsel took seriously the duty to comply with the Court's May and July Orders, and that their conduct was objectively unreasonable and in flagrant disregard of the Court's direct, specific orders. *Long*, 213 F.3d at 987; *Marrocco*, 996 F.2d at 224.

### B. CJT has offered no valid reason for its failure to comply with the Court's orders

In its written filings and at the June 7 hearing, CJT offered several reasons why its failure to comply with the Court's orders does not warrant sanctions.  None are convincing.

### 1.  Mr. Jett's testimony

On direct examination, Mr. Jett was questioned about numerous topics, including how many hours he works per week; preparation of CJT's tax returns; and his handling of CJT's business expenses, financial documents, balance sheets, bank statements, and payroll records.  As the Court stated at the hearing, none of this had much to do with the issue at hand—CJT's failure to comply with Court orders requiring it to produce records showing how much it was paid by Amazon.

Instead, Mr. Jett's testimony at the hearing, which was deliberately geared toward demonstrating his lack of business sophistication and lack of formal education and training regarding financial recordkeeping, obfuscated the main issue.  His testimony painted a picture of CJT as a smalltime "mom and pop" delivery service with little to no formal financial records or controls. However, the evidence demonstrated that CJT had gross income over $2.5

15

million in 2021 when it was working exclusively for Amazon.  The volume of
CJT's business and income is inconsistent with the narrative presented by Mr.
Jett.

But most importantly, Mr. Jett's testimony made clear that he knew
exactly what information the Amazon invoices contained, where they were
stored, and how to access them.  To the extent that CJT argues or suggests
that its failure to produce the Amazon invoices was due to Mr. Jett's ignorance
or inability to access the records, the Court finds that argument discredited
based on Mr. Jett's testimony, demeanor, and the scope of CJT's business with
Amazon.

Specifically, the Court does not credit Mr. Jett's repeated explanation
that he could not "get the invoices out of the portal" so they couldn't be
produced.  That explanation is completely undermined by the facts that (1)
CJT's counsel went to meet with Mr. Jett to get the invoices from the Amazon
portal and was able to do so, and (2) CJT timely produced screenshots of the
Amazon portal invoice lists.  *See* dkt. 114-4 at 24–45.  The Court is at a loss to
understand why counsel (1) tried to access the Amazon invoices only *after* the
Court imposed deadline for producing the Amazon documents had passed; and
(2) did not at least produce screenshots of the Amazon invoices themselves.

### 2.    Mr. Ellis' interpretation of the Court's discovery orders

Inexplicably, Mr. Ellis argued that the May Order didn't require CJT to
produce anything when it plainly did.  Dkt. 53 at 2 (Magistrate Judge's order
finding that CJT's records relating to "damages, including profits, income

16

statements, balance sheets, etc." were discoverable and ordering that "production shall be expedited and occur as soon as reasonably possible."). Mr. Ellis then argued he thought that CJT did not have any additional documents to produce in response to the July Order. But again, it plainly did—in addition to the documents that were produced on August 1, the Amazon invoices were accessible to Mr. Jett through the Amazon portal. Whether Mr. Ellis specifically knew that Mr. Jett had access to the Amazon invoices is beside the point. The critical fact is that Mr. Ellis did nothing further to comply with the July Order between the date it was issued and the August 9 production deadline.

### 3.   The validity of the Court's orders

Although not directly argued, Mr. Ellis repeatedly suggested that CJT was justified in not complying with the Court's discovery orders because Barrette had not timely pled the affirmative defense of mitigation or served a Rule 34 request for production of documents. This misses the point. On May 23, 2022, the Magistrate Judge unambiguously ruled that CJT had to produce "mitigation documents"—the core of which were the invoices showing how much CJT was paid by Amazon. Dkt. 53. From that point forward, CJT was obligated to produce the Amazon invoices regardless of whether Barrette had properly or timely pled mitigation as an affirmative defense and whether Barrette had served a Rule 34 document request. And even giving CJT and Mr. Ellis every conceivable benefit of the doubt, there's no support for CJT's argument that the May Order applied only to the non-party subpoena that

17

Barrette had served on Amazon, rather than to CJT.  *Id.* at 1 ("address[ing] a discovery dispute concerning . . . document requests to Plaintiff Clifton Jett Transport, Inc.").

What's more, the July Order could not have been clearer—it ordered CJT to produce documents showing its revenue for specific years and "Documents relating to CJT's subsequent work for Amazon."  Dkt. 64.  If Mr. Ellis believed that the July Order was wrong, or otherwise wanted to take issue with the scope of the order, he could have raised those issues with the Magistrate Judge before the already-extended production deadline.  The point is that choosing to simply ignore what was required by the July Order was not a valid option.  The failure to comply with the July Order was therefore objectively unreasonable.

### 4.    Confidentiality

Mr. Jett and Mr. Ellis repeatedly referenced confidentiality concerns related to CJT's contract with Amazon.  But that didn't justify their failure to produce the invoice records.  Mr. Jett testified that such concerns were not the reason CJT did not produce the Amazon invoices.  And the July Order specifically ordered CJT to produce the relevant documents regardless of any confidentiality obligations to Amazon.  Dkt. 64 at 2 (ordering production and referring to the Protective Order's procedure for designating documents as "Confidential").

### 5.    After-the-fact production

In an apparent attempt to mitigate the nature and extent of its failure to comply with the Court's orders, CJT repeatedly references the financial

documents that it eventually produced.  But that production was made only *after* the Court-imposed deadline for production had passed and *after* the motion for contempt had been filed.  The July Order had a deadline for producing documents showing how much money CJT had earned from Amazon—August 9, 2022.  That deadline must mean something.  No documents showing how much CJT earned from Amazon were produced by that date.  Belated production doesn't change that.

Regardless of the excuses, the failure to produce the Amazon invoices — which show exactly how much CJT had been paid by Amazon and which Mr. Jett knew could be viewed with one simple click in the portal—was "objectively unreasonable."  *Long*, 213 F.3d at 987.

### C. Barrette's efforts to comply with its discovery obligations

The July Order required Barrette to "supplement its discovery responses" with specific "limited documents" by August 16, 2022.  Dkt. 64 at 3; dkt. 71 at 3.  CJT argues that the "Verified Letter" that Barrette sent to CJT on August 2, 2022, failed to provide adequate information about how and when Barrette performed searches of its physical and digital data.  Dkt. 128 at 2–4, 11–13, 18–21.  CJT believes that Barrette's searches were insufficient because they failed to unearth an alleged "termination letter."  *Id.* at 2.

Barrette responds (1) that its August 2, 2022, Verified Letter complied with the July Order; (2) that CJT omitted key facts from its filings, including any reference to two letters Barrette sent CJT about its efforts to search emails and physical documents; (3) that CJT has known since at least May of 2022

that the supposed "termination letter" never existed, dkt. 136-2 at 19–20 (Boyle Dep. at 23:23–24:15); and (4) that CJT's motion for contempt, filed over seven months after the deadline for complying with the July Order and on the eve of the close of discovery, was not brought in good-faith but retaliatory and untimely.  Dkt. 137.

The Court concludes that Barrette complied with the July Order.  The Verified Letter from August 2, 2022, provides in-depth information about how and when Barrette searched its digital data for responsive documents as required by the July Order.  Dkt. 128-9 at 1–4.  And if CJT genuinely believed that the Verified Letter was insufficient, it had ample time to raise that issue with the Court before March 15, 2023.  Moreover, it's clear that CJT was aware of the additional information about Barrette's discovery efforts but omitted that information from its motion.

For all those reasons, the Court concludes that CJT's motion completely lacked merit.

## V.
## Sanctions

Having found that the conduct of CJT and Mr. Ellis was objectively unreasonable and in flagrant disregard of the Court's Orders, the Court must now consider what sanction is appropriate.  "[S]anctions . . . must be proportionate to the circumstances."  *Ebmeyer v. Brock*, 11 F.4th 537, 547 (7th Cir. 2021).  Under Rule 37, sanctions may include striking pleadings, dismissing an action, entering default judgment, and/or "ordering the disobedient party, the attorney advising that party, or both to pay the

reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(b)(2)(A) and (C); *see also* Fed. R. Civ. P. 16(f) (incorporating Rule 37 sanctions and allowing for an award of fees).  In crafting a proportionate sanction, the court must "weigh not only the straw that finally broke the camel's back, but all the straws that the recalcitrant party piled on over the course of the lawsuit."  *e360*, 658 F.3d at 643.

Taking the entire record and CJT's course of conduct into account here, the Court finds that **an award of attorney's fees and costs to Barrette** for the reasonable fees and expenses associated with litigating its motion for contempt, dkt. 72, responding to CJT's objection, dkt. 114, and defending against CJT's motion for contempt, dkt. 127, through final resolution of the fee award is appropriate and proportionate.

The Court chooses this sanction considering CJT's pattern of conduct, including, among other things, flagrantly disregarding its obligations to comply with the July Order; omitting relevant information from the motion against Barrette; and its discredited representations at the hearing.  As discussed above, both CJT and Mr. Ellis played a role in this pattern of conduct and bear personal responsibility for the result, so CJT and Mr. Ellis are **jointly and severally liable** for the attorney's fees and costs.  Fed. R. Civ. P. 37(b)(2)(C).

The Court considered dismissing CJT's claims with prejudice as Barrette requested, dkt. 72, but concludes that the monetary sanction as outlined above is proportionate to the offending conduct and therefore sufficient.[9]

## VI.
## Conclusion

For the reasons stated above, Barrette's motion against CJT, dkt. [72], is **GRANTED to the extent that**, pursuant to Federal Rule of Civil Procedure 37(b)(2)(C), CJT must pay Barrette's fees and costs outlined above.  CJT and Mr. Ellis are **jointly and severally liable** for that award.

The parties shall have **through August 1, 2023,** to confer to resolve the fees and expenses.  If they are unable to reach an agreement, Barrette may file an updated fee petition **by August 8, 2023**.  Briefing on the petition will follow the deadlines in Local Rule 7-1.  The pending motion for bill of costs, dkt. [112], is **denied as moot**.

For the reasons explained in footnote 3 of this Order, the Court **REJECTS** the Report & Recommendation, dkt. [106].  CJT's objection to the Report & Recommendation, dkt. [114], is **DENIED as moot**.

CJT's motion for contempt against Barrette, dkt. [127], is **DENIED**.

**SO ORDERED.**

Date: 7/12/2023

_James Patrick Hanlon_
James Patrick Hanlon
United States District Judge
Southern District of Indiana

---

[9] While this should be obvious, the Court expressly warns CJT and Mr. Ellis that any further disregard of Court orders will lead to immediate dismissal of CJT's claims with prejudice.  *EEOC v. Wal-mart Stores East, L.P.*, 46 F.4th 587, 601 (7th Cir. 2022) (collecting cases where dismissal was affirmed after adequate warning).

Distribution:

All electronically registered counsel