UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CLIFTON JETT TRANSPORT, INC., | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 1:21-cv-01064-JPH-MKK |
| BARRETTE OUTDOOR LIVING, INC., | ) ) ) |
| Defendant. | ) ) |
| BARRETTE OUTDOOR LIVING, INC., | ) ) ) |
| Counter Claimant, | ) ) |
| v. | ) ) |
| CLIFTON JETT TRANSPORT, INC., | ) ) |
| Counter Defendant. | ) ) |

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Clifton Jett Transport (CJT) provided transportation services for Defendant Barrette Outdoor Living by picking up product from Barrette's Indianapolis facility and making deliveries to various locations. After working together for nearly three years, CJT and Barrette signed an "Agreement for Transportation Service." Barrette later closed its Indianapolis facility, which CJT claims was a premature termination of the Agreement without cause, and therefore a breach of the Agreement. CJT then sued Barrette for what CJT alleged it was owed under the Agreement. Barrette countersued CJT and both

1

parties moved for summary judgment on their breach of contract claims. Dkts. 139 and 149. For the reasons below, Barrette's motion is **granted in part**, and CJT's motion is **denied in part.**

## I.
## Facts and Background

The parties have filed cross-motions for summary judgment, so the Court takes the motions "one at a time." *American Fam. Mut. Ins. v. Williams*, 832 F.3d 645, 648 (7th Cir. 2016). For each motion, the Court views and recites the evidence and draws all reasonable inferences "in favor of the non-moving party." *Id.*

In March 2016, CJT completed an "approved carrier profile" for Barrette and thereafter began providing transportation services to Barrette. Dkt. 150-1 at 15 (Clifton Jett Dep. at 68:1–5). CJT picked up Barrette's products from Barrette's Indianapolis distribution plant and made deliveries to Barrette's customers. Dkt. 140-13 at 25–26 (Mark Hicks Dep. at 33:19–34:10).

In 2019, CJT and Barrette signed an "Agreement for Transportation Service" ("Agreement") that was "effective for three years . . . unless terminated by either party." Dkt. 140-1 (copy of Agreement). The stated purpose of the agreement was CJT's "desire[] to furnish to [Barrette] motor carrier transportation and related services designed to meet the distinct needs of [Barrette]" and Barrette's "desire to obtain such services from [CJT]." *Id.* The Agreement also had a "Default/Termination" provision. Dkt. 140-1. For Barrette, the Agreement was signed by Mark Hicks, a manager, and for CJT it was signed by its owner, Clifton Jett. *Id.* at 4.

2

The Agreement provided specific terms that would cover "[e]ach shipment." *Id.* at 1 ¶ 3. For a shipment accepted by CJT, the Agreement obligated Barrette to pay CJT "in accordance with the rates, charges, rules and regulations as agreed upon in writing prior to delivery acceptance." *Id.* at 2 ¶ 5. The Agreement also provided that the "rates, charges, rules and regulations agreed upon also may be amended verbally in order to meet changing shipping schedules and other needs of the parties." *Id.* So, under the Agreement, Barrette would be obligated to pay CJT for a shipment that it placed with CJT and that CJT accepted for transport, under terms that could vary on a shipment-to-shipment basis.

The Agreement did not, however, require Barrette to place any specific number of shipments, or loads, with CJT. *See id.*; dkt. 150-1 at 38 (Clifton Jett Dep. at 166:9-24); dkt. 150-2 at 33 (Mark Hicks Dep. at 138:12–20). It also was not exclusive—Barrette was free to use other transporters for shipments and CJT was free to provide transportation for other shippers. *See* dkt. 140-1; dkt. 150-1 at 27 (Clifton Jett Dep. at 113:7-22); dkt. 150-2 at 30 (Mark Hicks Dep. at 127:16–18); dkt. 142 at 5.

In March 2020, Mr. Hicks told Mr. Jett that Barrette would be closing the Indianapolis distribution plant. Dkt. 150-2 at 12–13, 14 (Hicks Dep. at 40:1–41:19, 52:5–15). The Indianapolis distribution plant stopped shipping in September 2020 and closed in October. Dkt. 150-3 at 5 (John Boyle Dep. at 12:13–17). Thereafter, CJT informed Barrette of its belief that Barrette's closure of the Indianapolis distribution plant "triggered the involuntary

3

termination of the Agreement" and demanded payment of $362,525.46 "to compensate CJ[T] for the remainder of the term of the Agreement."  Dkt. 150-24 at 2.  Mr. Jett then emailed Barrette a summary of CJT's damages calculation.  Dkt. 140-5.  On October 26, 2020, Barrette informed CJT that it would not make any payments to CJT.  Dkt. 140-6 at 1.  After a series of communications between CJT and Barrette representatives, it became apparent that the parties could not reach a mutually agreeable resolution.

In March 2021, CJT sued Barrette, alleging that Barrette breached the Agreement and seeking "the remaining value of the Agreement" under the Default/Termination provision, lost revenue, and other damages. Dkt. 1 at 1; dkt. 1-1 at 6 (Complaint).  Barrette brought a counterclaim against CJT, alleging that CJT breached the Agreement by refusing to discuss providing services to Barrette outside of Indianapolis.  Dkt. 14 at 6–8.   CJT and Barrette have each moved for summary judgment on both their own claim and the opposing party's claim.  Dkt. 139; dkt. 149.

## II.
## Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party must inform the court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party meets this

burden, the nonmoving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324. In ruling on cross motions for summary judgment, the Court takes the motions "one at a time," viewing and reciting the evidence and drawing all reasonable inferences "in favor of the non-moving party." *Williams*, 832 F.3d at 648.

## III.
## Analysis

CJT argues that Barrette breached the Agreement by prematurely terminating it without cause. In its counterclaim, Barrette argues that CJT breached the Agreement when it refused to discuss providing services to Barrette's other facilities. The parties agree that Indiana law applies. Therefore, absent a controlling decision from the Indiana Supreme Court, the Court does its best to predict how that court would rule on the issues of law. *Mashallah, Inc. v. West Bend Mut. Ins. Co.*, 20 F.4th 311, 319 (7th Cir. 2021). In doing so, the Court may consider decisions from the Indiana Court of Appeals. *See id.*

"[T]he essential elements of a breach of contract action are: 1) the existence of a contract; 2) the defendant's breach thereof; and 3) damages." *Hopper v. Colonial Motel Props., Inc.*, 762 N.E.2d 181, 187 (Ind. Ct. App. 2002). "Indiana courts will not find uncertainty in contracts if logical construction can find certainty, but to be valid and enforceable the contract must be reasonably definite and certain." *Dayhuff v. Canonie Constr. Co.*, 283 N.E.2d 425, 427 (Ind. Ct. App. 1972). "The primary and overriding purpose of contract law is to

ascertain and give effect to the intentions of the parties." *Smart Corp. v. Grider*, 650 N.E.2d 80, 83 (Ind. Ct. App. 1995). "If the intention of the parties can be gleaned from their written expression, that intention must be effectuated by the court." *Id.* "Where possible, courts will construe contracts as being valid, rather than void." *Id.*

### A. Barrette's motion for summary judgment on CJT's breach of contract claim

Barrette argues that it's entitled to summary judgment on CJT's breach of contract claim because the Agreement does not require Barrette to do anything and therefore is not an enforceable contract. Dkt. 151 at 33–34. CJT responds that the Agreement is an enforceable contract because it "created mutual obligations under which CJT was to ship Barrette's product for the next three years." Dkt. 157 at 6. CJT further argues that because the Agreement is a contract for services rather than goods, it's enforceable. *Id.*

Under Indiana law, "it is fundamental that a contract is unenforceable if it fails to obligate the parties to do anything." *Licocci v. Cardinal Assocs., Inc.*, 445 N.E.2d 556, 559 (Ind. 1983). "Mutuality of obligation is essential to the validity of an executory bilateral contract which is based solely on mutual promises or covenant." *Security Bank & Tr. Co. v. Bogard*, 494 N.E.2d 965, 968 (Ind. Ct. App. 1986) (internal quotations omitted). "[M]utuality is absent when only one of the contracting parties is bound to perform, and the other party remains entirely free to choose whether or not to perform." *Id.*; *see also Davis v. Davis*, 151 N.E. 134, 136 (Ind. 1926).

6

Here, the Agreement did not obligate Barrette to use CJT to transport its products. It did not require a minimum number of shipments or specify a load delivery schedule. *See* dkt. 140-1. The Agreement therefore permitted Barrette to choose to place all, some, or none of its shipments with CJT. *See id.* In other words, the Agreement didn't obligate Barrette to conduct any business with CJT. Mr. Jett admitted as much in his deposition:

```
 9    Q.    But Barrette wasn't required to provide
10   you any set number of loads, correct?
11    A.    We -- it doesn't state that in the
12   contract.  But we were used to a certain amount of
13   loads, especially by June or July.
14    Q.    You were used to it, but Barrette wasn't
15   required to provide you --
16    A.    No.
17    Q.    -- with a certain number of loads?
18    A.    No.  We just operated that way.
19    Q.    Let me finish.
20    A.    Okay.
21    Q.    Sorry.  You were used to receiving loads
22   from Barrette, but Barrette was not required to
23   provide you with a minimum number of loads, correct?
24    A.    It's not stated in the contract.
```

Dkt. 150-1 at 38 (Clifton Jett Dep. at 166:9-24); dkt. 150-2 at 33 (Mark Hicks Dep. at 138:12–20). Mr. Jett said Barrette "could request anything they wanted to, big or small or not at all." Dkt. 150-1 at 28–29 (Clifton Jett Dep. at 120:7–121:1). And while an exclusivity provision can show mutuality of obligation, *see Dayhuff*, 283 N.E.2d at 427, here it's undisputed that the Agreement is not exclusive. *See* dkt. 142 at 5; dkt. 151 at 11; dkt. 150-1 at 27 (Clifton Jett Dep. at 113:7–116:25). Instead, Barrette could use CJT to transport its products on an as-needed basis, or not at all. The Agreement

7

therefore did not impose any obligation on Barrette. Lacking mutuality, the Agreement is not an enforceable contract.

*Zeyher v. S.S. & S. Manufacturing Co.*, 319 F.2d 606 (7th Cir. 1963), is instructive. There, the contract, a short letter containing just five provisions, employed plaintiff as a "Sales Engineer . . . for a period of three (3) years," with terms and conditions for commission payment and invoice preparation. *Id.* at 607 n.1. The district court found that:

> [T]he contract did not bind plaintiff to secure any orders, nor to sell a minimum or maximum of S.S. & S. products; did not provide for a reasonably certain way of determining the sales price or prices of S.S. & S products; did not bind S.S. & S. to accept any orders submitted by plaintiff; and did not provide a formula for determining when, if any, an obligation to accept an order would arise.

*Id.* Affirming the district court, the Seventh Circuit found "that the alleged contract was invalid and unenforceable for lack of certainty and mutuality," and therefore lacked any "obligation which either party can legally enforce against the other." *Id.*

In a situation that was "legally analogous" to the one presented in *Zeyher*, the Indiana Court of Appeals similarly found that plaintiff's "lack of obligation to accept the offer . . . defeat[ed] mutuality." *Dayhuff*, 283 N.E.2d at 426–27. On a one-page purchase order form, the plaintiff agreed to haul sand to a highway construction project "as required." *Id.* at 426. Shortly thereafter, defendant signed a similar agreement with another company. *Id.* at 427. Plaintiff sued, arguing that he had exclusive rights to the project. *Id.* Citing

8

*Zeyher,* the Court of Appeals affirmed the trial court's conclusion that the contract was not enforceable. *Id.*

Here, the Agreement looks like a contract and is lengthier than the one-page agreements in *Zeyher* and *Dayhuff*. Nevertheless, it does not obligate Barrette to place any shipments with CJT, so the result is the same. *See Meridian S.E.T., LLC v. Auditor of Marion Cnty.*, 961 N.E.2d 545 (Ind. Ct. App. 2012) (finding "no bargained-for exchange" between plaintiff and the City when neither party was required to act and neither had legal recourse against the other if a party failed to act) (unpublished but discussed in parties' briefing).

Like the purchase order in *Dayhuff*—which the court described as having a "series of unilateral offers with delivery constituting acceptance resulting in a series of severable and independent contracts," *Dayhuff,* 283 N.E.2d at 427—the Agreement here contemplated that Barrette was free to place one, many, or no shipments with CJT, and that each shipment was subject to CJT's acceptance and terms that may vary on a shipment-to-shipment basis. Put slightly differently, if Barrette placed a shipment with CJT (a "unilateral offer") and CJT agreed to carry that shipment ("acceptance"), then the terms of the Agreement would apply to that specific shipment. Like *Dayhuff*, these offers are "severable and independent"—the Agreement controlled each time a shipment was offered and accepted but had no force until that happened. *See id. But see Berkel & Co. Contractors, Inc. v. Palm & Associates, Inc.*, 814 N.E.2d 649, 656 (Ind. Ct. App. 2004) (finding a purchase order to "stake approximately

9

800 auger pilings," among other things, "reasonably definite in its terms" and therefore an enforceable contract).

CJT argues that the Agreement is enforceable because in it Barrette made three "promise[s]": "(1) pay CJT in accordance with the rates, rules and regulations as agreed upon in writing prior to delivery acceptance . . . ; (2) promptly pay CJT's substantially complete and correct invoices . . . ; [and] (3) pay CJT the pro rata remaining value of the term of the agreement in the event of an early termination . . . ." Dkt. 157 at 7–8. CJT says these constitute adequate consideration for the Agreement.[1]  *Id.*

But the first two "promises" concern payment and therefore would apply only after CJT had transported a shipment of goods for Barrette. As discussed above, Barrette had no obligation place any shipments with CJT, so any obligation on Barrette concerning terms of payment would arise only upon Barrette placing a shipment with CJT, which Barrette had no obligation to do. The payment-related terms therefore do not create mutuality as needed for an enforceable contract. The third "promise"—the default/termination provision— is essentially a liquidated damages provision. But the existence of a liquidated damages provision does not cure the lack of mutuality which makes a contract

---

[1] CJT uses the term "consideration" when arguing these promises "created mutual obligations." Indiana courts require "mutuality of obligation" from both parties. *See Bogard*, 494 N.E.2d at 968. Consideration and mutual obligation can overlap. *See Zeyher*, 319 F.2d at 607 (finding agreement unenforceable and discussing both consideration and mutuality of obligation); *Rogier v. American Testing & Eng'g Corp.*, 734 N.E.2d 606, 618 (Ct. App. Ind. 2000) (discussing requirement of mutuality and mentioning the "necessity of consideration"). Therefore, the Court construes CJT's argument as an attempt to show Barrette had an obligation under the Agreement.

unenforceable. Liquidated damage provisions are triggered by breach, *Weinreb v. Fannie Mae*, 993 N.E.2d 223, 232 (Ind. Ct. App. 2013), and an unenforceable contract cannot be breached.

Next, CJT argues that the Agreement is not "illusory" because the Indiana U.C.C. does not apply here. Dkt. 157 at 8. As discussed above, however, it is "fundamental that a contract is unenforceable if it fails to obligate the parties to do anything." *Licocci*, 445 N.E.2d 556, 559 (citing *Davis*, 151 N.E. 134, and other cases). CJT cites no case holding otherwise.

Last, CJT argues that the only services contract case cited by Barrette, *Meridian S.E.T.*, failed for lack of consideration, and is thus distinguishable. 961 N.E.2d 545 (unpublished); *see* dkt. 157 at 9–10. As discussed above, it is Barrette's lack of obligation to place loads or shipments exclusively with CJT that makes the Agreement unenforceable. *See* dkt. 151 at 34.

Barrette is therefore entitled to summary judgment on CJT's breach of contract claim, and CJT's motion for summary judgment on that claim therefore must be denied. Dkts. 139 and 149.

### B. Barrette's breach of contract counterclaim

Barrette brought a counterclaim against CJT for breach of contract. Dkt. 14. Later, Barrette moved to amend its answer and counterclaim, again asserting a single breach of contract claim. Dkt. 160. Although CJT does not make this argument, it appears that Barrette's breach of contract claim fails for the same reason CJT's claim did—lack of mutual obligation. Under Rule 56(f), the Court may, after giving notice and a reasonable time to respond, grant

11

summary judgment on a ground not raised by a party. Fed. R. Civ. P. 56(f). The Court **gives notice** of its intent to grant summary judgment to CJT and against Barrette on Barrette's counterclaim. Dkts. 139 and 149. Barrette's pending motion for leave to file its first amended answer and counterclaim, dkt. 160, would be denied as well for the same reason, *see* dkt. 160-1 at 12–13.

## IV.
## Conclusion

Barrette is entitled to summary judgment on CJT's breach of contract claim. Barrette **shall have through March 7, 2024** to **show cause** why CJT should not be granted summary judgment on Barrette's counterclaim and final judgment should not issue accordingly.

**SO ORDERED.**

Date: 2/22/2024

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

All electronically registered counsel